NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0093n.06

No. 22-2116

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Mar 01, 2024
KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN |
| ROBERT LEE CATO, JR., | ) ) | |
| Defendant-Appellant. | ) ) ) | OPINION |

Before: BATCHELDER, STRANCH, and DAVIS, Circuit Judges.

BATCHELDER, J., delivered the opinion of the court in which DAVIS, J., joined in full, and STRANCH, J., joined in part. STRANCH, J. (pp. 18–23), delivered a separate opinion concurring in all but the application of the enhancement explained in Section II.a. of the majority opinion.

**ALICE M. BATCHELDER, Circuit Judge.** Robert Lee Cato, Jr. pleaded guilty to distributing child pornography in violation of 18 U.S.C. § 2252A(a)(2)(A). After calculating Cato's recommended sentence under the United States Sentencing Guidelines, the district court imposed a sentence of 240 months' imprisonment. On appeal, Cato challenges two guidelines enhancements. First, the district court increased Cato's offense level by five points because his offense involved distributing child pornography for any valuable consideration other than pecuniary gain. U.S.S.G. § 2G2.2(b)(3)(B). Second, the district court increased Cato's offense level by five more points because Cato previously engaged in a pattern of activity involving the sexual abuse or exploitation of a minor. U.S.S.G. § 2G2.2(b)(5). Cato also challenges the special conditions of his supervised release. Because we find no error, we affirm.

**I.**

**a. Offense Conduct**

Cato pleaded guilty to distributing child pornography in violation of 18 U.S.C. § 2252A(a)(2)(A). Cato admitted that he used Kik Messenger, a messaging and social media application, to share three videos containing child pornography. The first video showed an adult female trying to engage in sexual intercourse with a naked prepubescent male between two and five years old. The second video showed two prepubescent girls, naked from the waist down, fondling each other's genital areas. And the third video showed an adult female inserting a pacifier into the vagina and anus of a female infant. Cato admitted that he shared these videos while living in Kalamazoo, Michigan.[1]

Cato also conversed with someone who used the screenname "Mel_Alt." This person sent Cato a photograph of someone separating the legs of a four-year-old girl, exposing her vagina. According to Mel_Alt, this girl was Mel_Alt's daughter. Cato told Mel_Alt that he was "just living vicariously through" Mel_Alt and was "enjoying everything that you are graciously sharing with me." Cato even printed out the picture and then sent Mel_Alt a picture that included the printed child pornography with either human or dog ejaculate on it. Cato also told Mel_Alt that he shared the picture of Mel_Alt's four-year-old daughter to at least one other group that shared child pornography.

**b. Past Conduct**

This was not Cato's first child-sex-related offense. In 2015, Cato was convicted under Michigan law for possessing sexually abusive material, accosting children for immoral purposes,

---

[1] At the time of his arrest, Cato resided in Truth or Consequences, New Mexico, where he moved either to get away from his family in Michigan or for the warmer weather.

using a computer to commit a crime, and using the internet to communicate with someone else to commit a crime. While investigating those crimes, law enforcement discovered that Cato had tried to convince two teenage girls to send him naked pictures. The first victim was Cato's fifteen-year-old niece. He sent her pornography and pictures of his exposed penis through Snapchat. In return, Cato requested that his fifteen-year-old niece send him naked pictures of herself. She did not comply.

Cato's second victim was the minor niece of Cato's then-girlfriend. When she was fifteen, Cato showed her nude images through his Facebook page and posted captions directed toward her by using her first initial. Cato would post images of nude women performing sex acts, and he told the minor niece that he would bring her Taco Bell for lunch if she performed these acts on him. He also twice sent roses to her at her high school on Valentine's Day. And Cato sent her pictures of his naked penis, first claiming that the pictures were meant for his girlfriend but later sending them without apology. Cato's girlfriend's niece eventually shared naked images of her breasts and buttocks as well as pictures of her undergarments.

### c. Sentencing Hearing

Cato made two objections to the PSR's calculation of his guidelines sentence.[2] First, he objected to the application of U.S.S.G. § 2G2.2(b)(3)(B), which provides a five-level enhancement when a defendant distributes child pornography for any valuable consideration other than pecuniary gain. We have previously held that this enhancement requires "an agreement or mutual understanding between two parties," rather than a "mere 'expectation of receipt.'" *United States v. Oliver*, 919 F.3d 393, 401 (6th Cir. 2019). Cato argued that his exchange with Mel_Alt—in which he thanked Mel_Alt for "graciously" sharing child pornography with him and stated he was

---

[2] Cato withdrew a third objection at his sentencing hearing.

"just living vicariously through" Mel_Alt—did not qualify as an agreement to exchange child pornography for anything of value.

To carry its evidentiary burden, the government introduced testimony from Mark Waldvogel, an FBI agent. Agent Waldvogel reviewed the communications on Cato's devices.[3] He reported that Cato exchanged images with Mel_Alt by printing out the image he received from Mel_Alt of Mel_Alt's four-year-old daughter's genitalia and then returned to Mel_Alt a picture of the printed child pornography with ejaculate on it. Agent Waldvogel also reported that Cato shared images, including images from Mel_Alt, with others via the messaging applications Telegram and Kik. Cato then received additional images of child pornography from the same people with whom he shared child pornography. In Agent Waldvogel's professional experience, because of the risks of sharing child pornography, distributors will require individuals—in order to provide authentication of their identity—to share existing child pornographic images and videos before receiving new ones. Cato traded child pornography through these messaging apps on a regular basis. Cato's counsel chose not to ask Agent Waldvogel any questions. Instead, counsel argued that Agent Waldvogel failed to provide any proof of specific exchanges that Cato had made.

The district court overruled Cato's objection to the five-level enhancement for distributing child pornography for valuable consideration other than pecuniary gain. It determined that Cato's child-pornography exchanges with others provided circumstantial evidence of the agreement required by *Oliver*.

Second, Cato objected to the application of U.S.S.G. § 2G2.2(b)(5), which provides a five-level enhancement when a defendant engaged in a pattern of activity involving the sexual abuse

---

[3] When law enforcement arrested Cato, officers confiscated four cell phones, four flash drives, eight compact disks, and one disposable camera with rolls of film.

or exploitation of a minor. Cato argued that his requests for naked photographs from his niece and his then-girlfriend's niece were not specific enough to qualify as sexual abuse or exploitation. He said that his niece never sent him naked pictures and that his then-girlfriend's niece sent him pictures of only her naked breasts and buttocks. The government responded that Cato sent pornography and pictures of his exposed penis to his niece, making clear his desire for sexually explicit pictures. The government also stated that Cato discussed with his then-girlfriend's niece the sexual acts he wanted her to perform on him, contending that, as to both minors, Cato tried to sexually exploit them.

The district court overruled Cato's second objection too, holding that the preponderance of evidence showed that Cato exhibited a pattern of trying to sexually abuse or exploit minors. In overruling both objections, the district court determined that Cato's total offense level was forty-two. When combined with his criminal-history of Category II, this offense level resulted in a guidelines range higher than the twenty-year statutory maximum. The district court determined that the guidelines sentence then became the statutory maximum.

The district court imposed a sentence of 240 months' imprisonment. While acknowledging Cato's dysfunctional childhood, the district court pointed out that Cato had committed serious crimes and that his conduct made him a significant threat to the public. The statutory maximum sentence would deter Cato from committing similar crimes in the future and deter others who may contemplate committing similar crimes. The district court also found that Cato needed significant supervision because he committed the instant offense soon after he had been discharged from parole.[4] To provide Cato with additional supervision, the district court imposed a ten-year term of

---

[4] Cato's state-sex-crime conviction above resulted in a prison sentence and then parole. Cato's parole ended in June of 2020.

supervised release. The supervised release includes a special condition that Cato may not associate with persons under the age of eighteen outside the presence of a responsible adult who knows about Cato's background and criminal offenses and is preapproved by Cato's probation officer. While on supervised release, Cato also is not permitted to date or socialize with anyone who has children under the age of eighteen without Cato's first receiving his probation officer's permission. Cato also may not use computers or electronic devices without the express permission of his probation officer, and he must have his computer use monitored.

In addition, the district court stated that even if Cato's offense level were thirty-seven, the resulting guidelines range would include the twenty-year statutory maximum, which the district court still would have imposed.

This appeal followed.

**II.**

A challenge to whether the district court calculated a defendant's guideline sentence correctly is a challenge to the procedural reasonableness of a sentence. *United States v. Gould*, 30 F.4th 538, 542 (6th Cir. 2022). We review for abuse of discretion challenges to a sentence's procedural reasonableness. *Id.* A district court abuses its discretion when it "fail[s] to calculate (or improperly calculate[es]) the Guidelines range." *Gall v. United States*, 552 U.S. 38, 51 (2007). We "deferentially review" the district court's evaluation of undisputed facts. *Gould*, 30 F.4th at 542. However, we review de novo the legal conclusions the district court made when applying the enhancement. *United States v. Buchanan*, 933 F.3d 501, 514 (6th Cir. 2019); *United States v. Canestraro*, 282 F.3d 427, 431 (6th Cir. 2002).

### a. Distribution for Valuable Consideration Other Than Pecuniary Gain

We consider first Cato's first challenge. The district court applied a five-level enhancement because Cato distributed child pornography "for any valuable consideration, but not for pecuniary gain." U.S.S.G. § 2G2.2(b)(3)(B). For this enhancement to apply, the government must show that the defendant: (1) "agreed—either explicitly or implicitly—to an exchange with another person" and (2) "knowingly distributed child pornography to that person" (3) "for the specific purpose of obtaining something of valuable consideration" (4) "from that same person." *United States v. Oliver*, 919 F.3d 393, 399 (6th Cir. 2019). The enhancement requires more than "a mere 'expectation of receipt.'" *Id.* at 401. Instead, the enhancement applies only when "the defendant understands or believes—even if incorrectly—that his distribution is in pursuance of his obligation under the agreement." *Id.* at 403. And additional child pornography that the defendant expects to receive in return qualifies as "something of valuable consideration." U.S.S.G. § 2G2.2 cmt. 1.

Cato argues that his conversation with Mel_Alt was not specific enough to warrant the application of this five-level enhancement. Although Cato sent a picture of him and his dog enjoying the child pornography Mel_Alt had shared, Cato claims that his conversation with Mel_Alt is not specific enough to conclude that he and Mel_Alt made an implicit or explicit agreement. Instead, Cato argues that telling Mel_Alt that he was "living vicariously through" him and was "really enjoying" the images that Mel_Alt was "graciously sharing" amounts to a mere expectation of receipt. But this argument is wholly irrelevant.

As the district court found, the record contains uncontested evidence that Cato agreed to distribute child pornography to others in return for valuable consideration other than pecuniary gain—namely, more child pornography. At sentencing, Agent Waldvogel testified that, based on his review of Cato's electronic devices, Cato had distributed child pornography via Telegram and

received additional child pornography from the same users to whom he had given child pornography. Cato also did the same via the messaging application Kik. As Agent Waldvogel described, because distributing child pornography carries criminal risk, people who seek child pornography must verify themselves or authenticate their desire by first sharing child pornography themselves. In essence, Cato knew that he would only receive new images and videos if he shared his collection first. In other words, this implicit agreement—I'll show you mine if you show me yours—is essential to the very communities in which Cato distributed child pornography. And Cato did not contest Agent Waldvogel's testimony.

Cato's exchanges via Telegram and Kik satisfy the elements necessary to apply the five-level enhancement in U.S.S.G. § 2G2.2(b)(3)(B). *See Oliver*, 919 F.3d at 399. Cato made implicit agreements to trade child pornography for additional child pornography. On appeal, he argues that the record "lacks evidence that any other person discussed or understood the 'contours' of an agreement with Mr. Cato." Reply Br. 2. This argument is not well taken. Agent Waldvogel testified that such agreements are commonplace among those who distribute child pornography. His testimony provided sufficient basis for the district court to find that the people with whom Cato exchanged child pornography understood this implicit tit-for-tat agreement. *See Oliver*, 919 F.3d at 405 (noting that actions can be circumstantial evidence of agreement to exchange child pornography). Indeed, *Oliver* cited to long-established principles from conspiracy cases holding "that 'acts done with a *common purpose* can establish an implicit agreement' and that a 'conspiracy may be inferred from relevant and competent circumstantial evidence, such as the acts of the *conspirators* themselves.'" *Id.* (emphasis in *Oliver*) (quoting *United States v. Milligan*, 17 F.3d 177, 182–83 (6th Cir. 1994)). It also recognized that "'[a] conspiracy may be inferred form

circumstantial evidence which may reasonably be interpreted as participation in a *common* plan.'" *Id.* (emphasis in *Oliver*) (quoting *United States v. Walls*, 293 F.3d 959, 967 (6th Cir. 2002)).

From this language, the *Oliver* case expressly allows district courts to consider the "reasonably inferred purpose" of both parties based on those parties' actions. *Id.* Agent Waldvogel's testimony adequately shows that Cato behaved as if he had made implicit agreements to exchange child pornography in return for more child pornography from that same person—and that Cato's counterparts would have understood the same. And in addition to citing Cato's interaction with Mel_Alt, the government encouraged the district court to apply the enhancement based on these exchanges via Kik and Telegram. The district court did so. As it properly found, Agent Waldvogel's testimony satisfied all the elements of *Oliver*: Cato made an implicit agreement to knowingly distribute child pornography in return for more child pornography from that same person. For this reason, the district court properly applied the first five-level enhancement.

Even if the district court misapplied this enhancement, doing so can amount only to harmless error. A procedural sentencing error is harmless when we are "convinced that the error at sentencing did not cause the defendant to receive a more severe sentence than would have existed without the error." *United States v. Davis*, 751 F.3d 769, 773 (6th Cir. 2014) (citation omitted). Cato's offense level was forty-two. Combined with his criminal-history category of II, Cato's guidelines sentence was higher than the statutory maximum of twenty years' imprisonment. 18 U.S.C. § 2252A(b)(1). Even if Cato's offense level were thirty-seven, his guidelines range would have included the statutory-maximum twenty-year sentence. The district court recognized this possibility, and it announced that without one of the five-level enhancements, it still would have sentenced Cato to a statutory-maximum sentence.

Cato argues that the district court's pronouncement is "boiler-plate language designed to thwart a deserved resentencing." *See United States v. Montgomery*, 969 F.3d 582, 583 (6th Cir. 2020) (Moore, J., concurring in denial of en banc rehearing). But the concurrence Cato cites notes that we have counted similar statements "as a point in favor of harmless error" in many other cases. *Id.* (collecting cases). And Cato offers no reason for us to suspect that the district court's statement was mere boiler-plate language. Instead, the district court's statement occurred immediately after it undertook a thorough examination of the sentencing factors. The district court placed great weight on Cato's extensive collection of child pornography, the need to specifically deter Cato from committing future offenses, and the danger Cato presents to the public. The circumstances of Cato's sentencing hearing assure us that the district court imposed a statutory-maximum sentence because of the appropriate sentencing factors—a sentence that would have remained the same even if one five-level enhancement were applied in error.[5]

### b. Engaging in a Pattern of Activity Involving the Sexual Abuse or Exploitation of a Minor

Now for Cato's second challenge. He received another five-level enhancement because he "engaged in a pattern of activity involving the sexual abuse or exploitation of a minor." U.S.S.G. § 2G2.2(b)(5). The pattern of activity that triggers this enhancement is "any combination of two or more separate instances of the sexual abuse or sexual exploitation of a minor by the defendant." U.S.S.G. § 2G2.2 cmt. n.1. It does not matter whether the abuse or exploitation "occurred during the course of the offense," "involved the same minor," or "resulted in a conviction." *Id.* "Sexual abuse" and "sexual exploitation" refer to enumerated federal child sex offenses, a state-law crime

---

[5] Cato is correct to say that, if both five-level enhancements were imposed in error, then the district court's statement would not prevent resentencing. Although true, for the reasons we set forth *infra*, the district court properly applied the five-level enhancement in U.S.S.G. § 2G2.2(b)(5). So we need not address the situation in which Cato's sentence would no longer amount to harmless error.

that would constitute an enumerated federal child sex offense, and "an attempt or conspiracy" to commit any of the offenses. *See id.* The Guidelines specify that sexual abuse or exploitation "does not include possession, accessing with intent to view, receipt, or trafficking in material relating to the sexual abuse or exploitation of a minor." *Id.*

The government directs our attention to two offenses relevant here. First, a defendant sexually exploits a child when the defendant "employs, uses, persuades, induces, entices, or coerces" a child to "engage in . . . any sexually explicit conduct for the purpose of producing any visual depiction of such conduct." 18 U.S.C. § 2251(a). Sexually explicit conduct means "sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal"; "masturbation"; or "lascivious exhibition of the anus, genitals, or pubic area of any person." 18 U.S.C. § 2256(2)(A). The conduct can be "actual or simulated." *Id.* A defendant commits attempted sexual exploitation of a child when the defendant "specifically intended to create child pornography . . . and took a substantial step towards the creation of child pornography." *United States v. Sims*, 708 F.3d 832, 835 (6th Cir. 2013). Second, a defendant coerces or entices a minor when the defendant uses "any facility or means of interstate . . . commerce" to "knowingly persuade[], induce[], entice[], or coerce[]" a minor to "engage in prostitution or any sexual activity for which any person can be charged with a criminal offense." 18 U.S.C. § 2422(b).

The district court correctly found that Cato's conduct with his niece and his ex-girlfriend's niece warranted the five-level enhancement of § 2G2.2(b)(5). First consider his interaction with his ex-girlfriend's niece. Cato posted "images of nude women" on his Facebook page and told his ex-girlfriend's niece that "the acts were things she could do to him" in exchange for his bringing her fast food. PSR, R.48, PageID#140. We have previously recognized that, for the crime of coercing or enticing a minor, the focus "always remains on the defendant's subjective intent

because the statute is 'designed to protect children from the act of solicitation itself.'" *United States v. Roman*, 795 F.3d 511, 516 (6th Cir. 2015) (citing *United States v. Hughes*, 632 F.3d 956, 961 (6th Cir. 2011)). The "essence of the crime" is a "communication or attempted communication with a minor child with the intent to transform the minor into a sexual victim." *Id.* Cato attempted to sexually abuse or exploit his ex-girlfriend's niece when he told her that he would bring her fast food in exchange for sex acts.

Cato confuses the record when he argues that the pictures he received from his ex-girlfriend's minor niece of her breasts, buttocks, and undergarments cannot constitute sexually explicit conduct. While such pictures may not fit into any of the categories listed in Section 2256(2)(A), Cato's behavior toward his ex-girlfriend's niece is best understood as coercing or enticing a minor to engage in criminal sexual activity under Section 2422(b). Cato takes issue with the "spartan information" contained in the PSR. Reply Br. 14. But it strains credulity to suggest that the "acts" Cato asked his ex-girlfriend's niece to perform were non-sexual. After all, he showed the girl images of nude women when describing the acts that he wanted her to perform. And a forensic examination of his telephone at this time discovered a great deal of child pornography, including "photos of prepubescent girls exposing their breasts and vaginas," images of nude prepubescent girls performing oral sex, and images of adults engaging in sexual acts with dogs. PSR, R.48, PageID#139–40. Cato's intent is the "pivotal issue," and he offers no reason to think that his was innocent. *Sims*, 708 F.3d at 835.

Finally, we turn to Cato's interaction with his own niece. Cato's niece did not comply with Cato's request to send him naked pictures of herself. But the niece's non-compliance is not dispositive of whether Cato's behavior was criminal. Once again, we must look to Cato's intent.

*Roman*, 795 F.3d at 516; *Sims*, 708 F.3d at 835. The PSR provided an uncontested finding[6] that Cato sent his niece "pornographic pictures" through Snapchat, including pictures of Cato's "exposed penis." PSR, R.48, PageID#139. Cato argues that because his niece never sent him naked pictures of herself, he could not have engaged in sexual exploitation. But crediting this argument would nullify the subsection that criminalizes attempting or conspiring to sexually exploit a child. *See* 18 U.S.C. § 2251(e). Under the logic of the argument Cato advances, unsuccessful attempts to sexually exploit children—such as when Cato asked his niece to send him naked pictures and she refused—would no longer be criminal.

We reject this argument. Instead, like many panels before us, we determine that the "pivotal issue" is Cato's intent. *Sims*, 708 F.3d at 835; *see also Roman*, 795 F.3d at 516. And the facts contained in the PSR sufficiently support the conclusion that Cato intended for his niece to send him a picture that would lasciviously exhibit her genitals.[7] After all, he sent her a picture of his own exposed penis and exposed her to pornographic images online. Again, Cato provides no evidence that he intended to receive something more innocent.

In imposing Cato's sentence, the district court placed great weight on Cato's extensive collection of child pornography, the need to specifically deter Cato from committing future offenses, and the danger Cato presents to the public. The circumstances of Cato's sentencing hearing assure us that the district court imposed a statutory-maximum sentence because of the

---

[6] A district court "may accept any undisputed portion of the presentence report as a finding of fact." Fed. R. Crim. P. 32(i)(3)(A); *see also United States v. Geerken*, 506 F.3d 461, 467 (6th Cir. 2007) (noting a district court can rely on even disputed facts if defendant "fails to produce any evidence to contradict the facts set forth in the PSR").

[7] In making this holding, we need not address Cato's argument that this circuit should adopt the D.C. Circuit's holding in *United States v. Hillie*, 39 F.4th 674, 685 (D.C. Cir. 2022).

appropriate sentencing factors—a sentence that would have remained the same even if one five-level enhancement were applied in error.

**III.**

Cato's final challenge is to the special conditions of his supervised release. We would normally review this challenge using an abuse-of-discretion standard. *See United States v. Inman*, 666 F.3d 1001, 1004 (6th Cir. 2012). But Cato never objected to his supervised-release conditions. Because he did not object, we review the special conditions only for plain error. *Inman*, 666 F.3d at 1003. This requires Cato to show (1) an error; (2) that is clear or obvious; (3) that affects his substantial rights; and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.* at 1003–04. This, he cannot do.

Cato challenges two conditions. The first condition permits Cato to use computers or other electronic devices only when given express permission by his probation officer. The second condition prevents Cato from dating or socializing with anyone who has children under the age of eighteen unless Cato first obtains the permission of his probation officer. Each condition reasonably relates to promoting Cato's rehabilitation while protecting the public. 18 U.S.C. § 3583(d). Neither condition amounts to plain error.

We turn first to the computer-monitoring condition. Cato confessed to his using messaging applications to electronically distribute child pornography. During a presentence interview, Cato stated that monitoring provided by parole "kept me out of trouble." When the pandemic isolated Cato from his support groups and prevented him from engaging with his church and community, Cato said, he "fell back into old habits." The computer-monitoring condition reasonably relates to promoting Cato's rehabilitation. It also protects the public by having a probation officer closely monitor Cato's internet use to reduce the odds that he will reoffend. Indeed, we have previously

upheld similar conditions of supervised release. *See United States v. Phillips*, 370 F. App'x 610, 621 (6th Cir. 2010) (upholding condition requiring probation-officer approval before using computers, the internet, or e-mail); *United States v. Smith*, 564 F. App'x 200, 208 (6th Cir. 2014) (upholding computer and internet limitation requiring monitoring and parole-officer supervision). Like the court in *Phillips*, we assume that a probation officer would not deny a probationer's using a computer "in a manner that would enable legitimate professional pursuits or other activities that would contribute to [his] rehabilitation." 370 F. App'x at 621. So here, if a probation officer were ever to unreasonably withhold permission, Cato could petition the court to "modify" or "reduce" the conditions of his supervised release. 18 U.S.C. § 3583(e)(2).

Cato also argues that the computer-monitoring condition sweeps too broadly because the district court imposed a preapproval requirement for both computers and electronic devices. Cato worries that the condition will force him to seek preapproval from his probation officer to use an electric toothbrush or a non-internet-capable alarm clock. We find such concerns misplaced. By imposing the preapproval condition on Cato's "computer use or other electronic device use," the district court showed that it used the term "electronic device" to refer to any other internet-capable device. *See United States v. Shultz*, 733 F.3d 616, 622 (6th Cir. 2013) (interpreting supervised-release condition in context). So the preapproval condition does not extend to an electric toothbrush or a non-internet-capable alarm clock—but it does cover smartphones, tablets, and anything else that Cato may use to browse the internet, a prohibition that reasonably relates to Cato's using the internet to distribute, receive, and solicit child pornography. Beyond this, we decline to engage in "mere conjecture" about how frequently society will require citizens to use internet-capable electronic devices in 2040, when Cato's sentence of incarceration will end. *United States v. Evers*, 669 F.3d 645, 662 (6th Cir. 2012) (citing *United States v. Massey*, 349 F. App'x

64, 70 (6th Cir. 2009)). As already stated, Cato may seek modification or reduction of the conditions of his supervised release. 18 U.S.C. § 3583(e)(2).

Cato's second condition is reasonable too. Cato pleaded guilty to distributing child pornography. And he previously tried to persuade two minors to send him naked pictures of themselves, including by his sending unsolicited pictures of his naked penis to them. He also asked one of those minors to perform sex acts on him in exchange for fast food. Requiring his probation officer's permission before dating or socializing with anyone with minor children thus serves to protect the public from the possibility that Cato would again relapse.

Cato argues that this condition will bar him from speaking to another adult at a grocery store—who unbeknownst to him happens to have a minor child—unless he obtains preapproval from his probation officer to do so. We again interpret the condition in its proper context. *Shultz*, 733 F.3d at 622. The district court imposed this condition because Cato sought child pornography from his niece and his ex-girlfriend's niece. The condition applies to prevent Cato's having repeated contact without preapproval with an adult whose child would be as vulnerable to this conduct as were Cato's niece and ex-girlfriend's niece. *See Socialize*, Merriam-Webster Dictionary Online, https://merriam-webster.com/dictionary/socialize (last accessed Feb. 26, 2024) (defining "socialize" as "to participate actively in a social group"). The condition does not prohibit truly "incidental" contact. *United States v. Zobel*, 696 F.3d 558, 574 (6th Cir. 2012). It instead prohibits the type of socializing that provided Cato an opportunity to sexually abuse or exploit his niece and ex-girlfriend's niece. And for this reason, it reasonably relates to protecting the public. 18 U.S.C. § 3583(d).

Consider the supervised-release conditions upheld in *Shultz*. The district court prevented the defendant on supervised release from associating with, being alone with, or being in the same

residence as a child without written approval from a probation officer. *Shultz*, 733 F.3d at 620. We upheld this condition because "[t]he probation officer is well placed to assess whether [the defendant] poses a danger to a particular child." *Id.* We also upheld the condition that the *Shultz* defendant not go near "any place where children . . . normally congregate . . . or any business that caters to [or] targets child customers." *Id.* at 621. We described this condition as "strict but for good reason." *Id.* We find that the same applies here even though the *Shultz* condition applied only to children while the condition here applies to adults with children—it is simply another condition preventing Cato from his having access to minors unless in the presence of a responsible adult preapproved by Cato's probation officer. Again, Cato previously preyed on his girlfriend's minor niece. The condition that Cato not date or socialize with anyone with minor children unless he first obtains approval from his probation officer protects the public by allowing the probation officer to assess whether Cato poses a danger to a particular child. The reason the district court imposed this condition is readily apparent from the record. We find no error here.

Because the district court did not err in imposing the special conditions Cato challenges, we uphold both conditions.

## IV.

For the foregoing reasons, we affirm Cato's sentence.

**STRANCH, Circuit Judge, concurring in part and dissenting in part.**

I concur with the majority in all respects except its affirmance of the district court's application of the enhancement in U.S.S.G. § 2G2.2(b)(3)(B), as the majority explained in Section II.a. I would hold that the district court failed to follow the analysis required under *United States v. Oliver*, 919 F.3d 393 (6th Cir. 2019), and improperly applied the enhancement. I agree, however, that Cato's sentence should be affirmed under harmless error review.

Section 2G2.2(b)(3)(B) directs a sentencing court to increase the offense level by five levels "[i]f the defendant distributed [prohibited material] in exchange for any valuable consideration, but not for pecuniary gain." This language reflects the 2016 amendment by the United States Sentencing Commission, which served to address the split among circuits regarding "the mental state required for the enhancement in the context of peer-to-peer programs."[1] *Oliver*, 919 F.3d at 398. As emphasized in *Oliver*, "[t]he Sentencing Commission considered the amendment 'an appropriate way to account for the higher level of culpability when the defendant had the specific purpose of distributing child pornographic material to another person in exchange for valuable consideration.'" *Id.* at 398 (quoting 2016 Amendments to the Sent'g Guidelines at 12).

Our governing precedent has made clear that to apply § 2G2.2(b)(3)(B), as amended, "the government must show that the defendant: (1) agreed—either explicitly or implicitly—to an exchange with another person under which (2) the defendant knowingly distributed child pornography to that other person (3) for the specific purpose of obtaining something of valuable consideration (4) from that same other person." *Oliver*, 919 F.3d at 397-98, 403. To find that "an

---

[1] "Peer-to-peer programs are 'file-sharing application[s which] allow[] two or more users to essentially have access [to] each other's computers and to directly swap files from their computers.'" *Oliver*, 919 F.3d at 398 (quoting 2016 Amendments to the Sent'g Guidelines at 10).

'implicit agreement'" existed, "a court must examine the purpose (or reasonably inferred purpose) of *both* parties, including the context of their discussions and circumstantial evidence such as their actions or comments." *Id.* at 405. This "requires an agreement or mutual understanding between two parties, rather than the defendant's personal belief or expectation." *Id.* at 401 (citing *Exchange*, Oxford English Dictionary (3d ed. 2018)). Under the plain meaning of the enhancement's amended language, "[w]ithout any statement or action from the 'other person' from which the defendant could reasonably extrapolate—even incorrectly—that the defendant's distribution was part of the agreement, the defendant has not 'agreed to an exchange' with that 'other person.'" *Id.* Our sister circuits agree. *See United States v. Morehouse*, 34 F.4th 381, 391-92 (4th Cir. 2022) (citing *Oliver* and adopting the test); *United States v. Halverson*, 897 F.3d 645, 652 (5th Cir. 2018) (adopting a similar four-part test).

Here, nothing in the excerpted messages indicates that Cato and Mel_alt struck an agreement. The Government introduced testimony by the FBI agent assigned to Cato's case, Mark Waldvogel, that users share photographs on social media applications to receive images in return; however, by the Government's own terms, this merely reflects Cato's distribution of photographs "for a particular purpose." It reveals nothing about Mel_alt's state of mind, much less a meeting-of-the-minds between Cato and Mel_alt regarding a commitment to exchange images. Absent evidence of a bargained-for exchange between Cato and Mel_alt, the Government failed to substantiate that Cato's images served as "valuable consideration" for purposes of the enhancement. USSG § 2G2.2(b)(3)(B).

Likewise, Agent Waldvogel's affirmation that Cato regularly "obtain[ed] other images from the same users to which he was distributing" is insufficient, on its own, to satisfy the enhancement because it reveals nothing about the other users' mindsets. Though the Government

described Cato's interactions on the application as "trading" child pornography "with other users," the PSR contained no excerpts or other details regarding the exchanges between Cato and these other users, and the Government did not introduce excerpts or attempt to paraphrase these conversations. Indeed, in response to Cato's objection to the PSR's application of the enhancement, the probation officer pointed exclusively to Cato's exchange of images with Mel_alt—not other social media application users. *See* R. 48, PageID 152 ("In this case, Mr. Cato clearly sent photos of child pornography and other pornographic images to 'Mel_alt' in the hopes of gaining additional child pornographic material. The probation officer believes this was scored appropriately and, accordingly, no change was made.").

At the sentencing hearing, Agent Waldvogel did not "provide any context of specific distribution that occurred and trades that were made." The Government focused exclusively on Cato's conduct. In keeping with long-established principles of conspiracy law, application of the enhancement also requires evidence of the mindset of "the 'other person.'" *Oliver*, 919 F.3d at 401; *see also United States v. Walls*, 293 F.3d 959, 967 (6th Cir. 2002) (emphasizing that "[t]o sustain a conviction" for drug conspiracy, "the government must prove the existence of an agreement to violate the drug laws and that each conspirator knew of, intended to join, and participated in the conspiracy").

On this record, the court had no factual basis to assess whether the other users entered into an agreed-upon bargain to provide Cato with explicit images in exchange for other pornography as is required by our own precedent. *See Oliver*, 919 F.3d at 401, 405. The court did not—and indeed, could not, on this record—determine whether "some kind of discussion or understanding between [Cato] and the [other application users] regarding the contours—whether implicit or explicit—of the agreement" to trade child pornography took place. *Id.* at 401. This record does

not demonstrate that Cato sent images "in response to another user's request to trade," *id.* at 402, or that the other users remarked to Cato "that the [social media application they were using] was 'better for trading pictures,'" *id.* (quoting *Cameron v. United States*, No. 1:17-cv-00275-JAW, 2018 WL 5801535, at *6-8 (D. Me. Nov. 6, 2018)). Nor does it provide any other indication of a bargained-for-exchange as required by *Oliver*, as there was no evidence of the other users' intentions at all. It was impossible, then, for the court to analyze "the purpose (or reasonably inferred purpose) of *both* parties," as it must under *Oliver*, 919 F.3d at 405, or to ascertain whether Cato's receipt of images from other users resulted from a gratuitous transfer rather than the "exchange for valuable consideration" to which the enhancement applies, U.S.S.G. § 2G2(b)(3)(B).

Simply accessing a social media site associated with child pornography is not sufficient under the enhancement's amended language. *See Oliver*, 919 F.3d at 402 ("As written, the enhancement makes no distinction between defendants who use peer-to-peer programs and defendants who directly engage with agents or other individuals."). Instead, the record must provide some indication of a bargain and meeting-of-the-minds to exchange images. *See id.* at 401-02; *see also Morehouse*, 34 F.4th at 391 (emphasizing that the 2016 amendment "requires the Government to show that the defendant entered an agreement *with a specific individual* that the defendant would provide child pornography in exchange for valuable consideration, such as additional child pornography") (emphasis added). This record contains no such indication. Agent Waldvogel's testimony based on his experiences in other child pornography cases cannot cure the lack of evidence in this case regarding the exchanges (generally), and the states of mind of the participants (specifically).

None of this is to suggest that *Oliver* interferes with district courts' inherent discretion to appropriately sentence defendants. Consistent with the "longstanding tradition in American law, dating back to the dawn of the Republic, that a judge at sentencing considers the whole person before him or her 'as an individual,'" district courts enjoy wide latitude in sentencing criminal defendants. *Concepcion v. United States*, 597 U.S. 481, 486 (2022) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)). The Guidelines "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 350 (2007). Procedural reasonableness accordingly requires a district court to begin its sentencing by properly calculating the Guidelines range. *See Gall v. United* States, 552 U.S. 38, 51 (2007). It is only after such a proper calculation that a court may, subject to the requirements of substantive reasonableness, *see United States v. Brooks*, 628 F.3d 791, 796 (6th Cir. 2011), vary from that range.

Given the discretion retained by the district court and the specific circumstances presented here, I concur in the affirmance of Cato's sentence on the basis that the district court's procedural error was ultimately harmless. "[A] remand for an error at sentencing is required unless we are certain that any such error was harmless—*i.e.* any such error 'did not affect the district court's selection of the sentence imposed.'" *United States v. Hazelwood*, 398 F.3d 792, 801 (6th Cir. 2005) (quoting *Williams v. United States*, 503 U.S. 193, 203 (1992)). With the five-level § 2G2.2(b)(3)(B) enhancement removed from the calculation of Cato's criminal history score, his total offense level under the Sentencing Guidelines would have been 37, rather than 42. Both offense level 37 and offense level 42 "have an advisory guideline range that includes the statutory maximum" of 20 years, or 240 months. The sentencing court stated that it "would still impose a sentence at the statutory maximum"—240 months, *see* 18 U.S.C. §§ 2252A(a)(2)(A) and (b)(1)— if Cato's offense score had been 37, not 42. The court explained its basis for that substantial

sentence after considering the need for both specific and general deterrence and acknowledging Cato's positive and negative personal characteristics, all of which led it to conclude that "Mr. Cato [was] a threat to the public." This explanation went beyond "unadorned boilerplate" that we have found insufficient to justify harmless error affirmance. *United States v. Walters*, No. 22-5930, 2023 WL 6601887, at *2 (6th Cir. Oct. 10, 2023) (quoting *United States v. Lucas*, Nos. 19-6390, 19-6392, 19-6393, 19-6394, 2021 WL 4099241, at *13 (6th Cir. Sept. 9, 2021)). Accordingly, I would treat the district court's § 2G2.2(b)(3)(B) error as harmless and affirm Cato's sentence. For these reasons, I concur in the majority opinion and dissent only from application of the enhancement as explained in Section II.a, and rely instead on a finding of harmless error.